

Robert Townsend
P. O Box 3330
Dana Point, CA 92629
Phone: (949) 495-0089
Fax:  (949) 495-0580
townsend@runbox.com

Plaintiff In *Pro Per*

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DIVISION OF CALIFORNIA



| | |
|---|---|
| ROBERT TOWNSEND,<br><br>**Plaintiff**<br><br><br>vs.<br><br>NATIONAL ARBITRATION<br>FORUM, INC.; NATIONAL<br>ARBITRATION FORUM, LLC;<br>AGORA FUND 1GP, LLC; MANN<br>BRACKEN, LLP; MB SOLUTIONS,<br>INC.; ACCRETIVE, LLC; ESKANOS<br>AND ADLER, P.C.; DISPUTE<br>MANAGEMENT SERVICES, LLC,<br>d/b/a/ FORTHRIGHT, INC.;<br>AXIANT, LLC; J.P. MORGAN<br>CHASE; CHASE BANK USA, N.A.;<br>BANK OF AMERICA, N.A.; WELLS<br>FARGO & COMPANY, INC.;<br>WELLS FARGO BANK, N.A.; FIRST<br>NATIONAL BANK OF NEBRASKA,<br>INC.; FIRST NATIONAL BANK OF<br>OMAHA, N.A.; FIRST NATIONAL<br>COLLECTION BUREAU, INC.;<br>GERALD E. MOORE &<br>ASSOCIATES, P.C.; FREDERICK J. | Case Number:<br><br>CV09-9325 PA (MLGx)<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. Violation of Cal. Civil Code §§1750-1784 (Consumer Legal Remedies Act)<br>2. Violations of 15 U.S.C. § 1692 *et seq.* (Federal FDCPA)<br>3. Violations of Cal. Civil Code §1788 *et seq.* (California FDCPA)<br>4. Violations of California Bus. & Prof. Code Section §17500 *et seq.*<br>5. Violations of California Bus. & Prof. Code Section §17200 *et seq.*<br>6. Violation of 15 U.S.C. §1 ISO (Conspiracy to Impose Mandatory Arbitration Clauses)<br>7. Violation of 15 U.S.C. §1 (Group Boycott/Concerted Refusal to Deal)<br>8. Use of Mail and Wire Fraud to Deprive Plaintiff of Right to Honest Services, per 18 U.S.C. § 1346<br>9. Violations of 18 U.S.C. § 1961 *et seq.* (Partial List of RICO Predicate Acts)<br>10. Violations of 18 U.S.C. § 1962(a)-(c) (Prohibited Racketeering Activity)<br>11. Violations of 18 U.S.C. § 1962 (d) (Conspiracy to Engage in Prohibited Racketeering Activity)<br><br>**DEMAND FOR JURY TRIAL** |

HANNA & ASSOCIATES, P.C.;
WEST ASSET MANAGEMENT,
INC.; WORLDWIDE ASSET
PURCHASING, LLC; WORLDWIDE
ASSET MANAGEMENT, INC.;
WORLWIDE ASSET PURCHASING
II, LLC; FREDERICK J. HANNA &
ASSOCIATES, P.C.; ASSET
MANAGEMENT PROFESSIONALS,
LLC; PALISADES COLLECTIONS,
LLC; ASTA FUNDING, INC.; ASTA
GROUP INC.; ASTA FUNDING
ACQUISITION I, LLC; ASTA
FUNDING ACQUISITION II, LLC;
ASTA FUNDING ACQUISITION III,
LLC; ASTA COMMERCIAL, LLC;
LOUIS R. FEINGOLD, ESQ.; TYE
HANNA; FREDERICK J. HANNA,
ESQ.; DARRELL T. HANNA;
FRANK JOSEPH HANNA III;
FRANK HANNA, JR.; J. MICHAEL
CLINE; MICHAEL KELLY; W.
CHRISTOPHER BRACKEN III;
CLAYTON DAVIS MOSELY;
WILLIAN CRISTOPHER BRACKEN
II; M. DOUGLAS MANN; JAMES D.
BRANTON; GERALD E. MOORE,
ESQ., DENNIS E. HENRY, ESQ.
Does 1-10, inclusive

**Defendants**

Plaintiff alleges, upon knowledge as to his own acts, and otherwise upon knowledge, information and belief, state as follows:

PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES
*ROBERT TOWNSEND V. NATIONAL ARBITRATION FORUM, INC.*, ET AL.

3

### INTRODUCTORY STATEMENT

1.  Most consumer credit card agreements contain mandatory arbitration clauses, which require consumers to forfeit their rights to litigate their disputes in court and mandate that any disputes be resolved through an alternative system of binding arbitration. Many of these agreements require disputes to be resolved exclusively through Defendant National Arbitration Forum ("NAF"). For years, NAF falsely held itself out as an independent provider of neutral arbitration services in consumer debt matters, unaffiliated with any persons or entities within or outside the collections industry. Now, NAF is under siege by local and state prosecutors for working alongside creditors, rubber-stamping illegitimate arbitration awards against consumers, deceiving the courts and the public, and undermining the integrity of the arbitration system.

2.  This action is also brought on behalf of this plaintiff who has held for many years hold general purpose cards (i.e., credit and charge cards) issued by Bank of America, J.P. Morgan Chase (which includes both the Chase and Bank One/First USA brands), Wells Fargo, Inc., Wells Fargo Bank, N.A., First National Bank of Nebraska, Inc., and First National Bank of Omaha.

3.  In part, this Complaint challenges the inclusion of a specific collusive term within the credit card contracts -- the arbitration clause -- imposed and maintained by each of the conspirators. Plaintiff's action does not concern other terms or the contracts as a whole (in this case, adhesion contracts) utilized by the conspirators in their customer relationships with Plaintiff. Plaintiff's action also pertains to the collusion between credit card companies, debt collectors, and the National Arbitration Foundation ("NAF") to rig the arbitration process against consumers and thwart consumer attempts to dispute and/or obtain unbiased arbitration proceedings related to the alleged debts.

4.  On or about January 5, 2007, February 9, 2007, March 8, 2007, Mann Bracken sent letters to plaintiff trying to collect several alleged debts from Plaintiff on behalf of with Chase Bank, USA, N.A. Contained within each of those letters was the following statement:

5. "The original contract you entered into with Chase Bank USA, N.A. or with a predecessor of Chase Bank USA, N.A. provides for resolution of claims or disputes by **binding arbitration."** (emphasis added)

6. On or about March 23, 2007, March 26, 2007, Mann Bracken sent Plaintiff a letter purporting to verify the validity of the various alleged Chase debts. These letters makes repeated allusions to NAF arbitration and implied threats to subject Townsend to NAF arbitration, including, "if we have not filed a claim against you and your fees and costs are $0.00, this could change at the Arbitrators[sic] discretion," and invites Plaintiff to e-mail Mann Bracken at arbitration@mannbracken.com."

7. The March 23, March 26, and April 16, 2007 letters contain fraudulent affidavits purporting to verify the validity of the alleged Chase debts. Upon information and belief, these affidavits are mass-produced, form-generated templates designed to ensure NAF arbitration judgments against consumers such as Plaintiff, regardless of the validity of the alleged debts in question. (In 99% of California credit card arbitration proceedings, the NAF ruled in favor of claims brought by Mann Bracken on behalf of banks.) The employees who allegedly signed these fraudulent affidavits did not testify that they had personal knowledge of the Plaintiff's alleged debts; also, the employees did not personally appear before the notaries public whose seal and signatures are affixed to the affidavit. (The notaries' seals indicate they are all located in Bexar County (San Antonio), Texas, where -- not coincidentally -- one of Mann Bracken's branch offices is located.) In fact, Mann Bracken is notorious for generating mass-produced, fraudulent affidavits. As of the date of this Complaint, Mann Bracken is a defendant in litigation initiated by New York state Attorney General for generating fraudulent affidavits in support of default judgments – including default arbitration judgments -- against consumers.

8. Throughout 2006 and 2008, each of the remaining debt collector Defendants sent Plaintiff letters (copies to be supplied during discovery) stating in one form or another the following that if Plaintiff disputed the validity of his alleged debts, the debt collectors would obtain a copy of judgments rendered against Plaintiff. Such statements falsely

PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES
*ROBERT TOWNSEND V. NATIONAL ARBITRATION FORUM, INC.*, ET AL.

5

implied the alleged debts have already been adjudicated and a valid court of competent jurisdiction or <u>mandatory arbitration</u> has reviewed all available evidence, determined this Plaintiff is the proper debtor, and rendered a judgment for the properly and legitimately calculated amount due.

9. In particular, debt collector Defendants Gerald E. Moore, P.C. ("the Moore firm") and Frederick J. Hanna & Associates ("the Hanna firm") are law firms whose sole practice is the collection of consumer debt. Both firms had relationships with the NAF and agreements with credit card company Defendants to profit from steering cases to NAF arbitration. Upon information and belief, the Moore and Hanna firms intended to attempt to force Plaintiff to submit to NAF arbitration and force Plaintiff to pay their attorney fees if Plaintiff failed to pay his alleged debts, despite the fact that the credit card companies had in fact sold Plaintiff's alleged debts to various junk debt buyer firms which shared common ownership with the Hanna and Moore firms, such as Defendants Worldwide Asset Purchasing, LLC, West Asset Management, Inc., Worldwide Asset Management, Inc., and Worldwide Asset Purchasing II, LLC.

10. Defendant Mann Bracken also claims to be a law firm specializing in consumer debt collection matters, but it is also a debt collector in its own right. Mann Bracken initiated thousands of so-called "arbitrations" through NAF; thousands of other consumers simply paid the alleged debts claimed due by Mann Bracken rather than be forced to pay to use the NAF and lose (the NAF charged consumers fees to participate in arbitration proceedings). Most of these arbitrations were against consumers from whom Mann-Bracken attempted to collect alleged credit card debts on behalf of its corporate <u>clients, *e.g.,* major credit</u> card companies. As a self-proclaimed "independent and impartial arbitration provider," NAF was supposed to provide arbitration services devoid of conflicts of interest.

11. In reality, NAF and Mann Bracken worked in tandem for the collections industry, their interests strictly aligned with credit card companies' consumers by virtue of their common owner, Defendant Accretive, LLC. Accretive owns and controls both NAF and Mann Bracken, and their related entities NAF was thus far from an "independent and impartial

arbitration provider," and instead, was a sham operation whose primary purpose was to rubber-stamp arbitration awards and confer the appearance of legitimacy upon Mann Bracken's debt collection efforts. NAF concealed its conflict of interest and provided bogus arbitration services instead of the legitimate dispute resolution services it promised and was contractually obligated to deliver to consumers.

12. The Attorney General of Minnesota recently exposed the concealed relationship between NAF and Mann Bracken, and the financial relationship with their common owner, a group of New York hedge funds known as Accretive LLC. According to the Attorney General's complaint, NAF "is financially affiliated with a New York hedge fund group that owns one of the country's major debt collection enterprises," which relationship NAF and Mann Bracken conceal from consumers. Within days, NAF was forced to announce it was getting out of the consumer arbitration business.

13. Plaintiff discovered the collusion between NAF, Mann Bracken, the Moore and Hanna firms, and the various credit card defendants when, in November 2009, he read an article in the *Wall Street Journal* entitled "Turmoil in Arbitration Empire Upends Credit Card Disputes," dated October 15, 2009. Plaintiff was shocked to the core at the facts described therein and has suffered great emotional distress.

14. The People of the State of California also sued NAF in a consumer fraud action brought by the City Attorney for the City of San Francisco According to the City Attorney's complaint, based on NAF's own statistics from 2003 to 2007, "in each and every case where a business entity brought a claim <u>against a consumer and th</u>e matter was disposed of by hearing, the NAF arbitrator ruled in favor of the business entity — "a 100% success rate." Cal. Super. Ct August 22, 2209. *State of California v. NAF*, Case No. 08-473569. As alleged, NAF maintained its near perfect success rate for businesses by engaging in deceptive and corrupt acts, including by:

   (a) establishing incentives for arbitrators to favor debt collectors over consumers

(b) disregarding consumers' evidence and or arguments;

(c) overlooking and violating its own Code of Procedure to benefit debt collectors, and ultimately, large creditors;

(d) disregarding creditors lack of evidence; and

(e) failing to provide the bona fide arbitration services it promised to consumers.

15. NAF and Mann Bracken worked hand-in-hand to create the illusion legitimacy and due process, with the purpose of railroading consumers into a corrupt dispute resolution process and bilking consumers out of hundreds or 16 thousands of dollars, including NAF charges and Mann Bracken's alleged legal including fees and costs Despite revelation of their ruse, neither NAF, Mann Bracken, or any of the other Defendants, including Accretive, has returned the money has returned the money consumers paid for the "arbitration" services they never received.

16. To commence debt collection, Mann Bracken submitted its collection letters to Plaintiff, with the intent thereafter to submit its claim to NAF, supported by fraudulent affidavits, and then mailed a "Notice of Arbitration", using a standardized form provided by NAF. The Notice from NAF would falsely claim that (a) NAF "is an independent and impartial arbitration organization, which does not give legal advice or represent parties"; and (b) "Parties have a full and equal right to present relevant and reliable direct and cross examination testimony, documents, exhibits, evidence and arguments." The Notice also provided that: "IF YOU DO NOT ... FILE WITH THE FORUM A WRITTEN RESPONSE, AN ARBITRATION AWARD MAY BE ENTERED AGAINST YOU [AND] AN ARBITRATION AWARD" MAY BE ENFORCED IN COURT AS A CIVIL JUDGMENT." (all-caps in original).

17. The Notice of Arbitration also directed consumers to NAF's Code of Procedure the "NAF Code") for information on filing a response. The NAF Code required, among other things, that the consumer's response "shall include" any fees as provided in the Fee Schedule". In addition to other fees and costs that were later tacked on to bogus arbitration awards (described below), the NAF Code required (the NAF Code 8 required consumers to make

Case 2:09-cv-09325-MWF-RNB    Document 1    Filed 12/21/09    Page 8 of 52    Page ID #:8

PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES
*ROBERT TOWNSEND V. NATIONAL ARBITRATION FORUM, INC.,* ET AL.

8

a $50.00 initial payment on the NAF "administration fee," in order to file a response to the Notice of Arbitration and avoid defaulting in the arbitration proceedings. Consumers that paid such consideration to NAF for "independent and impartial arbitration "services, would not receive the services for which they bargained. NAF and Mann Bracken knew, at the onset of arbitration, that regardless of whether this plaintiff actively participated in the arbitration proceedings or defaulted, consumers would be deprived of due process and would not receive legitimate dispute resolution services, and that NAF would issue an award against the consumer, in favor of Mann Bracken's credit card clients.

18. After a Notice of Arbitration is mailed to a consumer, a form letter on NAF's letterhead was generated with an "Award" in favor of the debt collector (Mann-Bracken and others) claimant and against the respondent consumer, and rubber-stamped by an NAF arbitrator. Although the award amounts and respondent names differed, the basic template remained the same, including the following rote "findings" and "conclusions," among others: (a) "The Arbitrator has reviewed all evidence exist;" (c) "The evidence submitted supports the issuance of this Award;" and (d) "The applicable substantive law supports the issuance of the Award."

19. The "Award in favor of the Claimant" is invariably for hundreds or thousands more than the debt owed. Plaintiff believe a sizeable gap between the amount of the alleged underlying debt and the amount awarded can be traced to the improper inclusion of Mann Bracken's legal fees and NAF-related costs, all to the end of enriching the parties at the expense of consumers such as Plaintiff. In the end, this plaintiff would have paid illegitimate fees and costs, including a $50.00 initial payment on the NAF administration fee and exorbitant legal fees and costs -- for services never rendered and for the futile exercise of having his debt dispute "decided" by the very party opposing them.

20. Defendants' conduct is particularly egregious because it compromises the legitimacy of our judicial system. Courts depend heavily upon the perceived integrity and efficiency of private arbitration. Indeed, California and other states fostered the growth of the arbitration industry by streamlining the process of converting arbitration awards into

PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES
*ROBERT TOWNSEND V. NATIONAL ARBITRATION FORUM, INC.,* ET AL.

judgments, as evidenced in Defendants' Notice of Arbitration: "AN ARBITRATION AWARD MAY BE ENFORCED IN COURT AS A CIVIL JUDGMENT." (emphasis in original) Defendants and each of them exploited this public interest opportunity by perverting (as will be seen following) private arbitration into an unregulated trough for themselves and the collections industry.

21. Creditors who took their business to Mann Bracken (and its predecessor, Eskanos & Adler, P.C., of California) and NAF did not have to worry about losing, regardless of the validity of any credit dispute which is exactly how Defendants appealed to large creditors and dominated the consumer debt arbitration market for years. Indeed, while holding itself out to the public as independent and neutral, "[b]ehind closed doors, NAF [sold] itself to lenders as an effective tool for collecting debts" *Business Week* (June 5, 2008). *Business Week* recently uncovered shocking 20 examples of NAF's marketing to debt collectors, including a late 2007 "confidential" PowerPoint presentation aimed at creditors that promised, among "marked increase in recovery rates over existing collection methods." The process of legitimizing alternative dispute resolution as an industry can only begin by requiring Defendants and each of them to disgorge their ill-gotten gains.

22. Together with co-conspirators Wells Fargo, Defendants and each of them control more than 86 percent of the United States general-purpose card market. Through their participation in numerous meetings and other communications, and as an exercise of their immense market power, Defendants combined, conspired, and agreed to implement and/or maintain mandatory arbitration clauses as a term and condition of sale.

23. The primary purpose of Defendants' arbitration clauses is to eliminate access to judicial fora and collective remedial action, including class actions, by their cardholders. Defendants' agreement to impose or maintain collusive arbitration clauses in their respective adhesion contracts with their cardholders (which Defendants refer to as "cardholder agreements") constitutes a *per se* violation of the antitrust laws, is an anti-competitive restraint on trade and serves no pro competitive purpose. As such, the arbitration clauses in the Defendants' cardholder "agreements" should be declared unlawful and the clauses voided.

24. Defendants' arbitration clauses are not the product of agreement with the cardholder in any meaningful sense. Defendants neither seek nor obtain any cardholder signature or other written evidence of an agreement by the cardholder to arbitrate. Defendants imposed and impose their arbitration clauses either by "amending" existing terms and conditions notices through change in terms announcements or other mailings, or by burying them in prolix, arcane, and lengthy terms "agreements". As such, this plaintiff was wholly unaware of the existence, let alone the implications, of the arbitration clauses. This plaintiff had no opportunity for meaningful or informed consent to any purported "agreement" to arbitrate. Having imposed their arbitration clauses on unwary consumers, Defendants may at any time compel (or mandate) arbitration of any claim of injury or wrongdoing made by a consumer, and block the assertion of any claim on a representative basis, all without the consumer ever having freely manifested his or her consent to the arbitration clause.

25. Defendants' compulsory arbitration clauses deprive cardholders of effective recourse for illegal anti-consumer and anti-competitive activity, secure an unfair advantage for Defendants in the dispute resolution process, and immunize Defendants from collective action by consumers. Defendants' collusion to impose arbitration clauses that ban judicial proceedings and actions have effectively negated the deterrent effects of, and remedies provided by, our nation's consumer, antitrust and other laws aimed at preventing corporate misconduct The arbitration clauses also enable Defendants to engage in wrongdoing free from public scrutiny. Unlike judicial proceedings, which are largely transparent, arbitration proceedings are often conducted in secret and the results are not publicly available. Moreover, the pervasiveness of these arbitration clauses and the wholesale elimination of judicial fora are rendered even more troubling by the institutional tendencies toward bias, if not outright bias in some cases, of arbitration administrators in favor of the card-issuing Defendants. By forcing cardholders to arbitrate, Defendants collectively intended to and have succeeded in reducing their legal exposure for widespread patterns of egregious and unlawful conduct.

26. Absent these constraints, Defendants can freely engage in anti-competitive or deceptive conduct that harms individual consumers in small amounts, but results in huge aggregate revenue to Defendants (concerning, *e.g.,* late fees, over limit fees, foreign transaction fees, APR, balance

PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES
*ROBERT TOWNSEND V. NATIONAL ARBITRATION FORUM, INC.,* ET AL.

11

computation procedures, notice or disclosure conduct, punitive pricing, collection practices, etc.), As the U.S. Supreme Court and many other courts have repeatedly recognized, a Judicial action frequently offers individuals with small claims their only real opportunity to receive justice. Eliminating litigation and remedies assures that no matter how egregious or pervasive the violation of law, such violations, weighed against the revenue to be achieved by the violations, will rarely, if ever, prove uneconomical to the Defendant banks.

27. Cardholders are forced to adhere to the clauses as written by Defendants on a take-it- or-leave-it basis. Because Defendants and their co-conspirators dominate the general purpose card market, the conspiracy is so all-encompassing that a consumer effectively must use cards containing an arbitration clause or cannot use a card (a necessity in today's economy) at all. Defendants' collusive conduct, as alleged in this complaint, suppresses competition in the general purpose card market by, *inter alia,* depriving cardholders of any meaningful choice concerning arbitration, stripping cardholders of valuable legal rights (including recourse to courts, juries, appellate procedures, evidentiary rights and protections), and effectively negating any meaningful recourse for unlawful conduct. As a result of the collective imposition of arbitration clauses as a term and condition of sale, Defendants have been able to reap supra-competitive profits. As a result of Defendants' ongoing conduct, Plaintiff has suffered and will continue to suffer harm or threatened harm to his business or property, and threatened loss or damage.

## "The Arbitration Coalition" and the Conspiracy to Impose Mandatory Arbitration Clauses

28. Beginning before late 1998 or early 1999, Defendants began communicating with each other and their co-conspirators concerning the imposition and use of mandatory arbitration clauses.

29. Immediately prior to their official launch of the group that later became known as the "Arbitration Coalition," Defendant Wells Fargo, Chase Bank, *et al.* and co-conspirators communicated with an attorney at Wilmer Cutler & Pickering, now known as Wilmer Cutler Pickering Hale and Dorr ("WCP"), for the purpose of organizing an "informal meeting" of senior in-house credit card counsel "representing the various segments of the U.S. credit card business," which they were to cosponsor.

30. This meeting took place on May 25, 1999, at the Washington, D.C. offices of WCP. The meeting was attended by Defendant Chase, as well as Capital One, Citibank, First USA, Household and Providian Banks, and others. MBNA Bank was invited to the meeting and expressed an intention to attend, but apparently did not attend. The agenda for the meeting included a planned discussion about arbitration clauses. This meeting provided an opportunity for Defendants and their co-conspirators to conspire concerning the adoption and implementation of arbitration clauses on an industry-wide basis.

31. At the time of the meeting, only two of its co-sponsors had acted to impose arbitration clauses containing judicial action bans. One co-conspirator's clause had not yet taken affect. Bank of America employed a simple arbitration clause that was silent as to judicial actions. None of the other Defendants had imposed arbitration clauses, in any form, on their cardholders.

32. Following this initial meeting and other discussions, Defendants formed an organization uniquely devoted to collectively promoting and implementing mandatory arbitration clauses, called the "Arbitration Coalition" or "Arbitration Group". The organization was initially instigated by (at least) First USA, primarily with the assistance of its consultant (a former Citibank lawyer), primarily through the efforts of its senior in-house counsel. The express purpose of the Arbitration Coalition was to defend and foster arbitration and promote the imposition of mandatory clauses.

33. Following the May 25, 1999 WCP meeting, First USA endeavored to generate a list of invitees to the "inaugural" Arbitration Coalition meeting to be held in July. For example, in June 23, 1999 e-mail, First USA informed others of its efforts to identify other credit card companies and organizations that would be interested in attending the inaugural meeting of the Arbitration Coalition. First USA indicated that a representative of GE Capital Corp., planned to attend the first meeting and that First USA would contact Household, Bank of America, Norwest (which had recently merged with co-conspirator Wells Fargo & Co.), and someone from MBNA to enlist their participation. First USA also advised that "rumor" had it that MBNA was "exploring" imposing an arbitration clause. Finally, First USA reported to that it had reached out to Ballard Spahr Andrews & Ingersoll, LLP ("Ballard Spahr") for assistance with these efforts. At or around the same time, First USA also contacted NAF, the arbitration "forum" utilized by First USA and others, to assist in identifying

Case 2:09-cv-09325-MWF-RNB   Document 1   Filed 12/21/09   Page 13 of 52   Page ID #:13

PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES
*ROBERT TOWNSEND V. NATIONAL ARBITRATION FORUM, INC.*, ET AL.

13

new members to join the Arbitration Coalition. NAF did, in fact, identify and provide First USA with the names of other companies who might be willing to participate in the Arbitration Coalition.

34. In mid-July, Defendants and their co-conspirators were invited to attend the inaugural meeting of the Arbitration Coalition at the offices of WCP to be held on July 28, 1999. The invitation identified the invitees as "[l] leading companies that have adopted or *are considering* adopting arbitration to resolve disputes with their consumer customers.... " (emphasis supplied). The agenda for the meeting emphasized actions the coalition could take by working together to use and promote arbitration. The first two steps listed were "sharing best practices" and "drafting an enforceable arbitration clauses". At the time of the meeting, many of the invitees, including most of the Defendants, did not utilize arbitration clauses in dealing with their consumers. Attendees at the July 28, 1999 meeting included: Bank have America, Chase, Citibank, Discover, First USA, and Household, and others as well as counsel from Ballard Spahr and WCP.

35. Defendants continued to communicate in August 1999 as they planned for the next Arbitration Coalition meeting. On August 4, 1999, First USA's in-house counsel e-mailed WCP concerning issues for the next Arbitration Coalition meeting and to schedule a call for later that day which would also include First USA's consultant. The suggested topics for that call included "sharing best practices", "how to set up an arbitration program"", arbitration price statistics" and "plain language vs. fine print and overkill". The e-mail reflects that the Arbitration Coalition continued to focus on methods to help its members draft and/or impose arbitration clauses.

36. That same day, WCP sent e-mail to members of the Arbitration Coalition, including an overwhelming majority of the Defendants, proposing that the next meeting be held in September. The e-mail emphasized that the members should continue to work together to develop arbitration clauses, stating: "We agreed to take a number of steps going forward, including sharing our thoughts and materials (including FAQ responses, customer information materials, and legal briefs) on the issues regarding arbitration that come up most frequently and pose the greatest difficulty." The e-mail also requested members to bring their arbitration-related materials to the next meeting.

PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES

*ROBERT TOWNSEND V. NATIONAL ARBITRATION FORUM, INC., ET AL.*

14

37. On September 29, 1999, Defendants Bank of America, Chase, Citibank, Discover, First USA, Household and their co-conspirators, as well as First USA's consultant, Ballard Spahr and WCP, attended another Arbitration Coalition meeting. As reflected by the meeting agenda, the group continued to focus on developing and adopting arbitration clauses, and on including Judicial bans in their arbitration clauses. The agenda for the meeting listed as a topic "discussion of the future of arbitration clauses in consumer contracts", with sub-topics, including: "adoption of arbitration clauses" and "the absence of class actions."

38. During the September 29 meeting, the Arbitration Coalition members discussed the "need to control Class Action litigation". Defendants Citibank and Household also discussed their internal plans regarding the adoption and imposition of mandatory arbitration clauses either at this meeting or during private conversations with Chase. In addition, at the meeting or during a private conversation with Chase, Defendant Bank of America reported on co-conspirator Wells Fargo's experience with and use of its arbitration clause - information which would not be publicly available.

39. Also during the September 29 meeting. Defendants explored the possibility of all members of the coalition adopting set criteria for their arbitration clauses, which many of the Arbitration Coalition members had not yet adopted as of that date. The arbitration clauses ultimately implemented by Defendants are materially identical because they are mandatory clauses, which ban judicial actions. Any differences in the respective clauses are immaterial to the ultimate purpose of the conspiracy: to eliminate judicial actions and other litigation with cardholders in an effort to harm consumers and retard competition.

40. The September 29 meeting also included a discussion of First USA's heavy reliance on NAF to assist in its collection practices. First USA advised the group of the favorable results it obtained from NAF, and revealed that it had paid NAF over $2 million in filing fees since 1998. All but one Defendant lists NAF as an arbitration administrator in their clauses - in fact, NAF is the exclusive provider for MBNA, First USA (prior to 2003), and (as of 2005) Discover and others, including Chase Bank, through Mann-Bracken, controlled by Axiant, LLC and its related companies.

41. As part of the Arbitration Coalition's concerted efforts to promote arbitration, in December 1999,

Defendants paid outside counsel, including WCP and Ballard Spahr, to draft and file *amicus curiae* briefs for the purpose of persuading courts to enforce onerous and one-sided arbitration clauses. Defendants engaged in similar activities with respect to other cases, in which the validity and enforceability of the mandatory arbitration clauses were challenged.

42. The Arbitration Coalition participated in at least sixteen meetings and/or conference calls following the November 17, 1999 meeting through October 2003, which were held on the following dates: January 12,2000; March 2,2000; April 18, 2000; June 14,2000; October 3, 2000; January 16, 2001; April 5, 2001; May 30, 2001; October 24, 2001; November 28, 2001; January 13, 2002; January 31,2002; June 13,2002; April22, 2003; June 25,2003; and October 16,2003. At these meetings, Defendants, and their co-conspirators continued to plan the imposition and use of arbitration clauses and their use to eliminate judicial actions and other litigation by the unwary consumer.

43. In addition to the Arbitration Coalition, Defendants formed and participated in two additional groups dedicated to using arbitration to eliminate class actions: the "Consumer Class Action Working Group" and the "In-House Counsel Working Group."

44. The Consumer Class Action Working Group was spawned from the Arbitration Coalition's ongoing frustrations with class actions, specifically and consumer judicial actions in general. Invitations to the first meeting of this group were disseminated on January 22, 2001 to the Defendants, co-conspirator Chase Bank, USA, N.A., and others. The group issued a "manifesto", which included filing of countersuits against class action lawyers, individual consumers, and suits for abuse of process. The first meeting of the Consumer Class Action Working Group took place on February 14, 2001. Defendants Bank First USA, Capital One, Chase, Citibank, Household, Providian and- co-conspirators Wells Fargo, as well as MasterCard attended the meeting. The meeting focused on tactics to combat consumer class action and other consumer judicial litigation actions. Arbitration Coalition members were assured that this "special meeting" did not reflect a decision to abandon the group's arbitration efforts but rather to use them as a "base" to see what could be done to help the consumer credit industry deal with lawsuits.

45. The second, and last known, meeting of the Consumer Class Action Working Group was held on May 30, 2001 at the offices of J.P. Morgan Chase & Company. At this meeting, Defendants again focused on tactics to combat consumer actions, including a discussion of the Federal Arbitration Act. Defendants Capital one, Chase, Citibank, First USA, Household, MBNA, Providian, and their co-

PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES
*ROBERT TOWNSEND V. NATIONAL ARBITRATION FORUM, INC.,* ET AL.

conspirator Wells Fargo, among others, attended the meeting.

46. Shortly after the last meeting of the Consumer Action Working Group, Defendants Capital One, Chase, and their co-conspirator Wells Fargo and others formed yet another group consisting solely of in-house counsel employed by Defendants. The "In-House Counsel Working Group" was created for the purpose of discussing issues that impacted only credit card issuers. The group consisted of Bank of America, Bank One, First USA, Capital One, Chase, Citibank, Household, MBNA, Providian, and Wells Fargo. Through this group, Defendants availed themselves of regular opportunities for communications and meetings to address issues relating to arbitration clauses and to share information concerning their business practices and strategies with respect to compulsory arbitration clauses. These meetings were secret and the precise number of contacts and meetings is not yet known.

47. The In-House Counsel Working Group continued to emphasize sharing information and "best practices" among Defendants for the purpose of developing means to collectively protect themselves from plaintiff actions. For example, the agenda for the July 9, 2001 conference call suggested "creating an informal 'information please' e-mail network" and that they should "discuss"[1] approaches to make the group successful," as well as "identify"[2] means to protect [Defendants] from the Plaintiff [sic] network." The pass code for the July 9 conference call was "ARBITRATION".

48. The invitational e-mail for the August 7,2001 conference call exhorted the group to "ask questions of the others so that we may be able to get some answers to the burning issues our business people keep raising," and to share information through discussing recent litigation, which undoubtedly included the arbitration issues, which were the subject of the ongoing meetings of the Arbitration Coalition. The agenda for a March 19,2002 In-House Counsel Working Group call included arbitration-related issues including "methods of disclosing arbitration clauses in solicitations. Shortly after the March 19 call, Defendants exchanged advice, and information on dealing with cardholders who sought to modify the arbitration administrators identified in Defendants' adhesion clauses.

49. On information and belief, Defendants' lawyers and executives participated in many more contacts and communications in addition to the meetings discussed above that have thus far been discovered. Evidence of some of these contacts and communications has been shielded and

PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES
*ROBERT TOWNSEND V. NATIONAL ARBITRATION FORUM, INC., ET AL.*

protected from disclosure by improper or incorrect invocations of the attorney-client privilege.

## The Arbitration Administrators

50. The ability of arbitration administrators selected by Defendants to remain absolutely neutral is open to serious question. Defendants' arbitration clauses do not permit cardholders to independently choose any arbitration administrator. Some clauses require the use of a specific administrator, while others allow cardholders to choose between two or three pre-selected administrators. These arbitration administrators have a strong incentive to favor Defendants who drafted the clause designating (and thus send business to) the administrator. All three of the arbitration administrators selected by Defendants have enforced the conspiratorially imposed consumer judicial action ban contained in the clauses.

51. The most egregious example is NAF. NAF is designated as an arbitration administrator for nearly every Defendant. It is the exclusive arbitration administrator of Chase Bank, USA, N.A. (through debt collectors Mann-Bracken) Discover and, until 2003, First USA (now owned by Chase). It is also designated as an arbitration administrator for Capital One, Chase, Citibank, Diners Club, Household, and Providian. NAF's activities are funded primarily through general-purpose card arbitrations. It is the only for-profit arbitration administrator used by Defendants. In handwritten notes of Chase's in-house counsel, written during the September 20, 1999 Coalition meeting, NAF was referred to as appearing to be a "creditor's tool."

52. NAF's record on arbitration reveals an inordinate tendency to favor defendants. In the case of *Bownes v. First USA Bank, N.A.,* Civil Action No. 99-2479-PR (Cir. Ct. Montgomery Cty.), First USA revealed that in arbitrations before the NAF, it prevailed in 19,618 cases, while the cardholder prevailed in only 87 cases, a success rate for First USA of 99.6%. (almost by not quite as good as Chase, Mann-Bracken and others in California) First USA has been a major "repeat player" for NAF as has Mann-Bracken, Chase Bank USA, N.A. and others.

53. NAF stresses in its promotional materials to companies that its rules prohibit claimants from proceeding on a Class action basis. For example, NAF's Curtis Brown wrote to a prospective client in 1999 that [a] number of courts around the country have held that a properly drafted arbitration

clause in credit applications and agreements <u>eliminates class actions</u> ... Of (emphasis in original.) This letter also, and utterly inappropriately for a purportedly neutral dispute resolution firm, promises that NAF arbitration "will <u>make a positive impact on the bottom line</u>". (emphasis in original.)

54. One NAF solicitation states in huge print that NAF is: **"The alternative to the million dollar lawsuit".** (emphasis added) The clear implication of this appeal to corporate clients is that arbitration through NAF will effectively eliminate any significant remedy in a consumer dispute, whatever the underlying merits. Plaintiff know of no court system in this country, which holds itself out as predisposed to eliminate or diminish defendant liability no matter the underlying merits.

55. A letter dated April 16, 1998, from Roger Haydock, NAF's Director of Arbitration, to a corporate defense lawyer warns that the "class action bar" is threatening to bring lawsuits involving the Y2K issue, and states that the *"only"* thing that will "prevent" such suits is the adoption of an NAF arbitration clause "in every contract, note and security agreement." The approach in Mr. Haydock's letter is not that of an even-handed neutral, but of an advocate advising defense counsel how to defeat an adversary.

56. A letter dated September 23, 1996 from NAF's Director of Development, Curtis D. Brown, to in-house counsel for a corporate lender, states: "By adding arbitration language to your contracts, the [NAF's] national system of arbitration lets you minimize lawsuits, and the threat of lender liability jury verdicts."

57. On January 29, 1997, Leaf Steines, a policy analyst for NAF, wrote the same lender's in-house counsel and urged, "[t] here is no reason for Saxon Mortgage, Inc. to be exposed to the costs and the risks of the jury system". An attachment to that letter offers free legal advice on how lenders can defeat consumer judicial actions where common questions predominate and consumer judicial actions claims are typical.

58. In one advertisement distributed to corporate in-house counsel on NAF letterhead, NAF pronounced that its rules provide for "[v]ery little, if any, discovery." This NAF rule is also likely to disadvantage many consumers and defeat meritorious claims.

**Mandatory Arbitration Clauses**

59.     Defendants and their co-conspirators Chase, and Wells Fargo among others have combined, conspired and contracted to adopt, implement, maintain, and include a specific term - the mandatory arbitration clauses prohibiting consumer judicial actions in their respective cardholder agreements. Defendants' collusion to impose and maintain arbitration clauses, in violation of the Shennan Act, renders the clauses voidable and unenforceable. Accordingly, valid and binding agreements to arbitrate were never formed,

60.   The conspiracy was facilitated by the manner in which the clauses were imposed and are maintained. While Defendants agreed between and among themselves to impose arbitration clauses, Plaintiff and other members of the cardholding public did not affirmatively agree to accept them.

61.   Defendants imposed the arbitration clauses on their cardholders in a manner designed to avoid detection by cardholders. The clauses were either engrafted onto existing cardholder agreements through change in terms notices or buried in the cardholder agreements of new cardholders. By hiding the arbitration clauses in change of terms announcements or cardholder agreements, Defendants did not reasonably inform their cardholders of the arbitration clauses or their consequences. Either way, Plaintiff and other cardholders did not "agree" to the arbitration clauses. The clauses are **NOT** signed by any "party" to them.

62.   Silence on the part of cardholders is not evidence of an "agreement" to arbitrate. Defendants employ two tactics in which they can attempt to assert that a cardholder's silence constitutes a willingness to "agree" to the imposition of the arbitration clause. In one example, Defendants attempt to create a binding agreement to arbitrate based upon the mere fact that a cardholder continued to use their card after a "change in terms" announcement was purportedly mailed by the issuer. In an another effort to artificially create the appearance of an "agreement" by existing cardholders at the time the clause was first implemented, a few Defendants allowed an existing cardholder to opt-out of the clause and retain their account. In neither instance does the cardholder knowingly assent to the newly added arbitration clause.

**Effect of the Conspiracy**

63. The purpose and effect of Defendants' unlawful concerted conduct and conspiracy is to inhibit competition and harm consumers by obtaining a non-price trade advantage, which would not be available in the absence of concerted activity, and has resulted in supra-competitive profits by shielding Defendants from liability arising from any illegal conduct or practice. The conspiracy also deprives Plaintiff of any meaningful choice concerning arbitration of disputes and severely limited, and limits, his ability to obtain a general-purpose card that does not require compulsory arbitration.

64. Defendants' conspiracy also shields their conduct from judicial and public scrutiny and accountability, thus enabling Defendants to engage in anti-competitive conduct in violation of the Sherman Act and other laws under a shroud of secrecy, effectively negating any recourse by Plaintiff for Defendants' unlawful conduct continuing through current date, including RICO conduct. Any differences in the language of Defendants' respective clauses are immaterial to the purpose of the conspiracy.

65. Without his knowledge or consent, Plaintiff suffers the loss of a number of rights and procedural protections available in the judicial system. For example, unlike a judge, an arbitrator is neither publicly chosen nor publicly accountable. Arbitrators in most cases are not required to give a reasoned explanation of the result Arbitrators need not follow the rules of evidence. The discovery available in arbitration is also severely limited, as NAF touted to its prospective credit card bank clients and their debt collectors. For example, it would have been impossible to develop in arbitration the discovery concerning the collusion to impose arbitration clauses that has developed herein. One of the leading corporate proponents of forced arbitration has openly stated that arbitration strips consumers of familiar protections: "Arbitration materially changes the dispute resolution rules that consumers and borrowers are accustomed to: there is no right to a jury trial, pre-hearing discovery is limited, class actions are eliminated and appeals are severely circumscribed." Indeed, one of the main objectives of the conspiracy alleged herein is to eradicate individual consumer judicial and class actions.

66. As the California Supreme Court noted, when a private litigation ban is "found in a consumer contract of adhesion in a setting in which disputes between the contracting parties predictably involve small amounts of damages, and when it is alleged that the party with superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of small

Case 2:09-cv-09325-MWF-RNB    Document 1    Filed 12/21/09    Page 21 of 52    Page ID #:21

PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES
*ROBERT TOWNSEND V. NATIONAL ARBITRATION FORUM, INC.,* ET AL.

21

sums of money ... such waivers are unconscionable ... and should not be enforced." *Discover Bank v. Superior Court,* 2005 Cal. LEXIS 6866 at 27, 28.

67. Arbitration also largely takes place in secret. The rules of the three arbitration administrators utilized by Defendants require that all parties to a dispute keep all facts about the dispute and the arbitrator's resolution of the dispute "confidential." This secrecy undermines the public function of litigation.

68. Defendants have engaged in this unlawful concerted activity in order to insulate themselves from any potential financial exposure for their illegal criminal; civil RICO conduct. Defendants' goal of acting with impunity can only be accomplished through eviscerating consumers' rights by such means as requiring arbitration of claims asserted by cardholders before arbitration organizations who are subject to the economic pressure of the Defendants. The purpose and effect of the conspiracy is to permit Defendants to evade consumer protection, antitrust and other laws aimed at curbing corporate abuse to the economic harm of Plaintiff.

69. Not only do Defendants use arbitration clauses to insulate themselves against class actions, they also use the clauses offensively against individual cardholding consumers. The Office of the Comptroller of the Currency has observed that mandatory arbitration clauses "have been associated with abusive lending practices". Office of the Comptroller of the Currency, Administrator of National Banks, Guidelines for National Banks to Guard Against Abusive and Predatory Lending Practices, **OCE** Advisory Letter 2003-2, at 2,3 (February 21, 2003). For example, some Defendants have combined with NAF to use mandatory arbitration clauses to "fast track" disputes over credit card debt into rapid arbitration. This practice is used to force cardholders to become liable for debts as a result of the cardholder's lack of knowledge of the arbitral process, e.g., default awards against victims of identity theft or fraud where these individuals are normally not held liable under applicable law. Such default awards often require the consumer to pay the costs of arbitration, including the card issuer's attorneys' fees. Curtis Brown, NAF's General Counsel, touted the advantages of utilizing arbitration clauses in collection practices to Chase, stating that a consumer's attorney has a greater ability to delay a collection action in court than in arbitration and that credit card issuers receive a favorable result in the vast majority of cases that go to arbitration.

PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES                                                                22
*ROBERT TOWNSEND V. NATIONAL ARBITRATION FORUM, INC., ET AL.*

70. Absent the conspiracy, most, if not all, of the bank/credit card Defendants would not have imposed materially identical compulsory arbitration clauses, including clauses prohibiting class actions

71. Plaintiff is not aware of the true names and capacities of defendants sued as DOES 1 through 100, and therefore sue these defendants by such fictitious names. Each fictitiously named defendant is responsible in some manner for the occurrences alleged in this Complaint. Plaintiff will amend this Complaint to add the true names of the fictitiously named defendants once they are discovered.

## JURISDICTION AND VENUE

This Court has jurisdiction of the federal claims asserted pursuant to 28 U.S. C. §1331. The Court has supplemental jurisdiction of the state law claims asserted pursuant to 28 U.S. C. §1367(a). Venue is proper in this district pursuant to 28 U.S. C. §1391 because the Defendants or some of them were conducting business in this district and many of the events occurred in this district. Furthermore, Plaintiff resides in this district.

This Court has personal jurisdiction over Defendants because Defendants conduct substantial business in this District, have sufficient minimum contacts with this state, and otherwise purposely avail themselves of the markets in this state through the promotion, sale, and marketing of their services in this state, to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Defendants do business in this District and receive substantial fees from customers in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

72. Plaintiff, an individual, at all times relevant herein, was a resident of Orange County, California.

73. Plaintiff is informed and believes, and thereon alleges, that Bank of America (hereinafter BOA was/is a Corporation, organized and existing under the laws of the State of California and doing business in California, including in Orange County. Bank of America, N.A. (USA) and all of its predecessors, affiliates, and subsidiaries are collectively referred to as "BOA"

74. Plaintiff informed and believes and based thereon allege that at all times mentioned herein, Wells Fargo, N.A. was/is a Corporation, solely organized and existing under the laws of the State of Dakota and registered as a foreign corporation in the State of California. Wells Fargo, N.A. and all of its predecessors, affiliates, and subsidiaries are collectively referred to as "WELLS."

75. J.P. Morgan Chase is a financial holding company organized under Delaware law with its principal place of business located in New York, New York, and is joined as a defendant in this Complaint J.P. Morgan Chase was formed by the merger, on July 1,2004, of J.P. Morgan Chase & Co. and Bank One Corporation. The merger was touted as creating the second largest banking franchise in the United States. J.P. Morgan Chase and all of its predecessors, affiliates, and subsidiaries are collectively referred to as "CHASE."

76. Chase Bank USA, N.A. issues J.P. Morgan Chase's general purpose cards and is joined as a defendant in this Complaint. Chase Bank USA, N.A. is the successor entity to Chase Manhattan Bank USA, N.A., and the successor entity to Bank One, Delaware, N.A. (formerly First USA Bank, N.A.). During all or part of the course of the conspiracy, general purpose cards were issued by Chase Bank USA, N.A. and its predecessors, affiliates and subsidiaries, including Chase Manhattan Bank USA, N.A., Bank One Delaware, N.A. and First USA Bank, N.A. Chase Bank USA, N.A and all of its predecessors, affiliates, and subsidiaries are collectively referred to as "CHASE" as well.

77. Plaintiff is informed and believes, and thereon alleges, that Defendant FIRST NATIONAL BANK OF OMAHA, (hereinafter "FNB"), a subsidiary of First National of Nebraska, is a NEBRASKA corporation with its commercial banking headquarters in Omaha Nebraska, and doing business in California, including in Orange County. FIRST NATIONAL BANK OF OMAHA, (hereinafter "FNB"), a subsidiary of First National of Nebraska and all of its predecessors, affiliates, and subsidiaries are collectively referred to as "FNB".

78. Defendant National Arbitration Forum, Inc. ("NAF Inc.") IS a Minnesota limited liability company with its registered address and principal place of operations at 6465 Wayzata Blvd., St. Louis Park, Minnesota 55426. It does business as "National Arbitration Forum" and "Forum." And is doing business in California, including in Orange County. Defendant National Arbitration Forum, Inc and all of its predecessors, affiliates, and subsidiaries are collectively referred to as "NAF".

79. Defendant National Arbitration Forum, LLC ("NAF LLC") IS a Minnesota limited

liability company with its registered address and principal place of operations at 6465 Wayzata Blvd., St. Louis Park, Minnesota 55426. It does business as "National Arbitration Forum" and "Forum." And is doing business in California, including in Orange County. Defendant National Arbitration Forum, LLC is wholly owned by ("NAF Inc.") and all of its predecessors, affiliates, and subsidiaries are collectively referred to as "NAF." as well. Collectively, Defendants NAF Inc., NAF LLC, referred as "NAF" throughout this Complaint. As detailed below, NAF was organized and operated as one entity until it split itself into three entities to obscure its relationship with the other Defendants named in this Complaint.

80. Defendant Accretive LLC ("Accretive") is a Delaware limited liability company with its headquarters at 51 Madison Avenue, 31 st Floor, New York, NY 7 10010, and its registered address at 55 East 59th Street, 22nd floor, New York, NY  10022. Accretive consists of a family of private equity funds under the control of investment manager J. Michael Cline ("Cline") and is doing business in California, including in Orange County. Accretive owned and controlled the other Defendants and aided and abetted their wrongful conduct.

81. Defendant Agora Fund I GP, LLC ("Agora") is a Delaware limited liability company with its headquarters at 55 East 59th Street, 22nd floor, New 14 York, NY 10022. Agora is the managing partner of Agora Fund I, LP, a Delaware limited partnership, Agora Fund I Co investment Partners, LP, a Delaware limited partnership, and Agora Fund I Holding Partners, a Delaware general partnership (collectively, the "Agora Funds"), Agora is under the control of Accretive's Cline and is doing business in California, including in Orange County.

82. Defendant Mann Bracken, LLP ("Mann Bracken") is a debt collector, organized as a Delaware limited liability partnership, with principal offices in Rockville, Maryland. It is the successor firm that resulted from the merger of three large debt-collection law firms: California-based Eskanos & Adler, Georgia-based Mann Bracken, and Maryland-based Wolpoff & Abramson. It and its other related owner-officer Defendants listed are individuals who, at times relevant herein, were and are doing business in California, including in Orange County.

83. Both Mann Bracken and Axiant's websites refer to a "strategic alliance" between the two entities. For example, Axiant states that it provides "call center collections facilitated through our strategic alliance with Mann Bracken, LLP" and that it provides both "national arbitration services" and "litigation services" "through Mann Bracken, LLP".

84. Individual Defendants MICHAEL CLINE; MICHAEL KELLY; W. CHRISTOPHER BRACKEN III; CLAYTON DAVIS MOSELY; WILLIAN CRISTOPHER BRACKEN II; M. DOUGLAS MANN; JAMES D. BRANTON are managers, owners, partners, or shareholders in Mann Bracken, LLP, Accretive, Agora Funds, Forthright, and the NAF.

85. Defendant First National Collection Bureau (hereinafter referred to as FNCB) is a State of Nevada Corporation and other related Defendants listed are individuals who, at all times relevant herein, were employed in or conducting business in behalf of FNCB in California and Orange County.

86. Defendant GERALD E. MOORE & ASSOCIATES a Professional Corporation, (hereinafter GMA) is a debt collector, organized as a State of Georgia Professional Law Corporation with a principle place of business in Atlanta, GA and is doing Business in California and Orange County.

87. Individual Defendant GERALD E. MOORE, ESQ., is owner and and manager of the Law Offices of Gerald E. Moore, P.C. and controlled and directed the policies and business activities of the Moore firm at all times relevant to the claims herein.

88. Defendant WEST ASSET MANAGEMENT, Inc (hereinafter referred to as WAM) is a State of Georgia Corporation and other related Defendants listed are individuals who, at all times relevant herein, were employed in or conducting business in behalf of WAM in California and Orange County.

89. Defendant WORLWIDE ASSET PURCHASING LLC, and other related Defendants listed are individuals who, (hereinafter referred to as WAP) is a State of Georgia Corporation at all times relevant herein, were employed in or conducting business in behalf of WAP in California and Orange County.

90. Defendant WORLDWIDE ASSET MANAGEMENT, INC and other related Defendants listed are individuals who, (hereinafter referred to as WAMI) are a State of Georgia Corporation at all times relevant herein, were employed in or conducting business in behalf of WAM in California and Orange County.

PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES
*ROBERT TOWNSEND V. NATIONAL ARBITRATION FORUM, INC.,* ET AL.

26

91. Defendant WORLWIDE ASSET PURCHASING II, LLC, and other related Defendants listed are individuals who, (hereinafter referred to as WAP) are a State of Georgia Corporation at all times relevant herein, were employed in or conducting business in behalf of WAP in California and Orange County.

92. Defendant FREDERICK J. HANNA & ASSOCIATES, P.C. (hereinafter referred to as HANNA) and other related owner-officer Defendants listed are individuals who, at all times relevant herein, were employed in or conducting business in behalf of HANNA in California and Orange County.

93. Individual Defendants LOUIS R. FEINGOLD, ESQ.; TYE HANNA; FREDERICK J. HANNA, ESQ.; DARRELL T. HANNA; FRANK JOSEPH HANNA III; FRANK HANNA, JR., and DENNIS HENRY, ESQ. are or were owners, partners, and managers of Frederick J. Hanna & Associates, and controlled and directed the policies and business activities of Frederick J. Hanna & Associates, P.C., relevant to the claims herein.

94. Defendant ASSET MANAGEMENT PROFESSIONALS, LLC. (hereinafter referred to as AMP) and other related Defendants listed are individuals who, at all times relevant herein, were employed in or conducting business in behalf of AMP in California and Orange County.

95. Defendant WORLDWIDE ASSET INC. (hereinafter referred to as WAI) is a State of Nevada Corporation and other related Defendants listed are individuals who, at all times relevant herein, were employed in or conducting business in behalf of WAI in California and Orange County.

## GENERAL ALLEGATIONS

96.    Arbitration is a form of alternative dispute resolution that can offer substantial benefits in judicial access and efficiency. However, arbitration also exacts a price by requiring consumers to give up their rights to litigate the dispute or appeal the arbitration awards. Arbitration awards are binding on the parties and cannot be reviewed except in narrow circumstances.

97. Only a handful of arbitration service providers exist. NAF dominated consumer arbitrations in the credit card debt collections industry. Recent public enforcement actions challenge NAF's misrepresentations to the public that it is an independent and neutral

arbiter These lawsuits allege NAF's claims are contradicted by NAF's own reported statistics which reflect astounding success rates for businesses over consumers.

98. NAF's guaranteed success rate for businesses is hardly surprising given that NAF is owned by the same hedge fund group (Accretive) that owns debt collection agencies, Axiant and Mann Bracken, which arbitrated against consumers before NAF. As reported, NAF, Axiant, and Mann Bracken are under the common control and ownership of Accretive, which financially benefits from arbitration awards obtained by Axiant and Mann Bracken, and fees collected by NAF. Thus, control group that owns and controls debt collectors Axiant and Mann Bracken also owns and controls the purportedly independent NAF.

99. Defendants hid their financial affiliation for years until the Minnesota Attorney General's recent lawsuit revealed Defendants' true ownership structure, as summarized below.

### Accretive Owns and Controls Mann Bracken

100. Around June 2006, Accretive met with officers of NAF, which was then a single entity (the Forum), to discuss the possibility of Accretive acquiring a stake in the Forum. Accretive told NAF that it was "very impressed" with the Forum's arbitration business and wanted to assist the company with cash and future business. In return, Accretive sought a 40% stake in the Forum

101. Around the same time, three large debt-collection law firms merged to form Mann Bracken, which in turn sold its assets and collections operations to Axiant -- a company created and owned by Accretive. The executives of the Forum were aware of this merger and sale as were others within the within the banking, delinquent debt collection, and distressed debt purchasing industry.

102. As talks between Accretive and the Forum advanced, the two sides realized that any public acknowledgement of the relationship between the Forum, any public acknowledgement of the relationship between the Forum, Accretive, and Axiant-Mann Bracken would destroy the Forum's credibility, and hence its ability to attract business and collect lucrative fees.

103. To avoid transparency to the public and those not in the banking, delinquent debt collection, and distressed debt purchasing industry, the two sides entered into multiple

transactions which, among other things, involved the Forum splitting into three parts – NAF Inc., NAF LLC, and Forthright. Thus, although NAF Inc., NAF LLC, and Forthright purport to be three separate companies, in fact, they are one and the same organization. They have key officers and directors in common, and their addresses and office spaces are identical.

104. In order to ensure Accretive received the 40% stake it bargained for Accretive demanded that Forthright -- the only NAF company in which Accretive had a stake -- enter into a Services Agreement with NAF LLC. Around the same time, Accretive created several funds, called the Agora funds, which were registered to the same address as, and controlled by the same person that controlled Accretive. The Agora funds then purchased approximately 40% of Forthright.

105. As reported, the Services Agreement provided that Forthright would receive the bulk of the "arbitration services" revenue after costs, and would control much of the administrative aspects of arbitration. In return, Forthright received from NAF LLC a seven figure monthly fee plus a bonus fee calculated based on NAF LLC's revenue.

106. Through its ownership in Forthright and the Services Agreement between NAF LLC and Forthright (imposed by Accretive), Accretive achieved exactly what it sought -- a 40% stake in the National Arbitration Forum, and equally important, significant ownership and control over **both** the major arbitration arm (NAF) and the major debt collection arm (Mann Bracken) of the consumer debt collections industry.

107. As reported, while negotiating these transactions, Accretive explained to NAF that "[0]ur investors have entrusted us with their funds on an assumption that we maintain a high level of governance oversight over our portfolio companies." Accretive accomplished as much with NAF, exercising control over NAF in at least the following ways:

    a.  Accretive directed NAF LLC and Forthright to enter into the Services Agreement to ensure itself a 40% stake in NAF;

    b.    Accretive created, invested in and shared employees and offices

        i.  with each of the Agora Funds, which in turn invested in and controlled NAF;

    c.  Accretive provided, through its principals, resumes to NAF for NAF to consider in filling key positions, including the chief financial officer and   chief operating

officer;

d. Accretive continually sought to enlarge NAF's business by introducing new customers to NAF, helping NAF bid for new contracts, and seeking out new areas for NAF expansion;

e. Accretive helped NAF devise public relations campaigns, including opposition to proposed federal legislation designed to weaken mandatory arbitration clauses; and

f. Accretive required Forthright to submit detailed reports on its operations to Accretive.

108. Similarly, Accretive exercised control over Axiant and Mann Bracken, by among other things, owning 68.7% of Axiant, employing members of Axiant's Board of Directors, and requiring Mann Bracken to submit detailed reports on its operations (just as it required of Forthright).

### Defendants' Scheme Deceived Consumers and the Courts

109. Many consumer credit contracts contain provisions mandating arbitration for disputes between the creditor and the consumer. NAF, as a major beneficiary of these mandatory arbitration provisions, sought to quell consumers'(well founded) fears by offering false assurances of integrity and impartiality, including the following posted on its website during the relevant time period:

1. We are guided by experience, integrity and innovation.

2. Our commitment to professional and legal standards produces clear, unbiased rules, and we accord disputing parties rights and privileges consistent with those of the judicial system.

3. The former judges and experienced attorneys who hear and decide our cases review the facts and render decisions based on known rules and substantive law.

110.    The Notice of Arbitration directed consumers to the NAF Code, which also reinforced the misrepresentations, including the following:

PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES
*ROBERT TOWNSEND V. NATIONAL ARBITRATION FORUM, INC.*, ET AL.

30

   a.  "[NAF] arbitrators are neutral, independent, experienced and knowledgeable about the applicable law";

   b.    "A neutral Arbitrator shall not serve if circumstances exist that create a conflict of interest or cause the Arbitrator to be unfair or biased";

   c.  "This code shall be interpreted to provide all Parties with a fair and impartial arbitration and with reasonable access to civil justice"; and

   d.  "Awards shall be based upon a preponderance of the evidence presented, unless an agreement of the Parties or the applicable law provides otherwise."

111.    NAF's website also contained numerous misrepresentations, including the following:

   a.  NAF "accord[s] disputing parties rights and privileges consistent with those of the judicial system";

   b.  "Disputes are brought before a neutral third party (the arbitrator) who, after carefully reviewing all of the relevant information, issues a final decision in favor of one of the parties";

   c.  NAF "is an independent administrator of alternative dispute resolution services. Cases are heard and decided by unbiased legal experts";

   d.  NAF's "dispute resolution processes are designed to provide dispute resolution process."

112.  NAF's alleged "Bill of Rights" contained similar misrepresentations including the following:

   a.  NAF provides a "justice system where claims are promptly resolved under the law by neutral legal experts at a cost commensurate with the matters in dispute;

   b.  NAF's "Participatory Hearing provides parties with virtually the same procedures available in court trials before a judge: written claims and responses, reasonable discovery, useful motions, direct and cross examinations of witnesses, introduction of relevant and reliable exhibits, opening and closing statements, a prompt and detailed award"; and

   c.   "The [NAF] Code of Procedure provides all parties with equal access to discovery and allows generally for the same discovery methods that are available in federal court."

113. The boilerplate awards rubber-stamped by NAF arbitrators, binding on consumers and relied upon by the courts, provided the following illusory "findings" and "conclusions," among others:

   a.   "The Arbitrator has reviewed all evidence submitted in this case

   b.   "The Arbitrator knows of no conflict of interests that exist;"

   c.   "The evidence submitted supports the issuance of this Award

   d.   "The applicable substantive law supports the issuance of the award.

114. Defendants knew or should have known these statements to be false and misleading, and thus the statements constitute a deception on the courts and this plaintiff.

115. The results of NAF's arbitrations stand in stark contrast to Defendants' misrepresentations. According to the San Francisco City Attorney's complaint filed on August 22, 2008, in California alone, from January 1, 2003 to March 31, 2007, NAF handled over 33,948 consumer collections matters, of which 18,075 were disposed of by hearing before an arbitrator. In *all* cases where a business brought a claim against a consumer and the matter was disposed of by hearing, the NAF arbitrator ruled in favor of the business **100% of the time**, assisted by the high rate of consumer defaults in these hearings. Indeed, only 30 of 18,075 cases resulted in a consumer victory and *all* of these involved the rare case where a consumer brought a claim against a business.

116. The San Francisco City Attorney's allegations regarding NAF's track record are consistent with the allegations of a former NAF employee, who herself sought to avoid mandatory arbitration due to NAF's practices and sued Forthright. According to this former employee's complaint, NAF routinely:

   a.   directed arbitrators to change decisions if they were adverse to certain favored clients or potential clients (known within NAF as "Famous Parties");

    b.  ensured that arbitrators who ruled against Famous Parties were not hired again;

    c.  drafted claim forms for Famous Parties;

    d.  drafted fictitious affidavits and/or proofs of service to consumers;

    e.  failed to forward responses filed by consumers to arbitrators;

    f.  decided and issued its own rulings on procedural matters against consumers in lieu of an arbitrator's rulings

117. The former employee also reported that NAF's arbitrators attempted to curry favor with NAF management in order to receive more assignments. These assignments paid as much as $325/hour. Incredibly, some arbitrators even called NAF's lawyers to ask them how they should rule on a particular case.

118. Similarly, Business Week recently revealed a September 2007 NAF marketing PowerPoint presentation aimed at creditors, labeled as "confidential," that not only promised a "marked increase" in collection recovery rates, but also boasts [ed] that [a] creditor may request procedural maneuvers that can tilt arbitration in their favor. 'Stays and dismissals of action requests available without fee when request by Claimant -- allows claimant to control process and timeline. According to an anonymous NAF arbitrator, these tactics allowed creditors to file actions even if they are not prepared, in that "[I]f there is no response [from the debtor], you're golden. If you get a problematic [debtor], then you can request a stay or dismissal. Thus, in countless cases, a creditor received a default award, just because the debtor failed to respond to the notice of arbitration that was **ALLEGEDLY** (emphasis added) sent to him/her, and despite the creditor's failure to produce any evidence verifying the amount owed, or that the alleged debt was owed at all.

119. Accordingly, NAF entered arbitration awards against consumers no matter how baseless the creditor's claim, including in cases where:

    a.  the consumer was obviously not the same consumer who had incurred the debt but someone with a similar name;

    b.  the consumer was a victim of identity theft;

    c.  the consumer never received a notice of arbitration;

    d.  Mann Bracken and the other debt collecting or buying defendants failed to prove the existence of an arbitration agreement between the creditor and consumer or any

PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES
*ROBERT TOWNSEND V. NATIONAL ARBITRATION FORUM, INC., ET AL.*

existing judgment as stated and implied.

e.   Mann Bracken and the other debt collecting or buying defendants failed to document that it was lawfully authorized to collect the debt, or that there was an existing debt at all;

f.   the alleged debt was past the statute of limitations;

g.   the consumer sought to submit evidence or otherwise defend him/herself in the proceedings but was denied an opportunity to do so.

h.   The amount sought in the arbitration award exceeded the actual amounts due, if any, and often reflected attorney or other fees not authorized by contract;

120. In addition to awarding debt collectors the amount of the debt they NAF consistently awarded additional sums to cover "expenses" and" attorneys fees." These expenses included fees charged by NAF itself for its part in the arbitration process. Specifically, NAF charged an "Administrative Fee" for its services, ranging from about $100 to over $1,000, and collected the first $50 of that fee at the time consumers filed their initial response to the Notice of Arbitration. Any portion of the fee that was not paid by the consumer up-front was later made part of NAF's "arbitration award."

121. As reported, NAF did not independently verify that any of the "expenses" (other than its own fees) were actually incurred by Mann Bracken and other debt collectors or buyers for their so-called debt collection services, nor did it even require Mann Bracken and the other debt collecting or buying defendants to account for its time spent on a matter before awarding attorney and other fees.

122. Defendants sought to enforce these sham arbitration awards, which are virtually immune from judicial review, and included inflated amounts exceeding the alleged debts owed, including illegitimate fees sought by Mann Bracken and other debt collectors or buyers for their so-called debt collection and NAF. Furthermore, Accretive Aided and Abetted the Deception Perpetrated on Consumers and the Courts. Accretive aided and abetted the unfair and unlawful practices alleged, by, among other things:

a.   forming the Agora Funds in order to obscure the financial relationship amongst the Defendants;

b.   engaging in transactions to obscure its ownership and control;

c.   advising creditors how to utilize NAF as a debt collection tool.

PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES

*ROBERT TOWNSEND V. NATIONAL ARBITRATION FORUM, INC., ET AL.*

34

## FIRST CAUSE OF ACTION

### (Violation of Consumer Legal Remedies Act, by all Defendants)

123.    Plaintiff now re-alleges each and every fact and allegation as set forth above and below at length, and hereby incorporates same by reference, as if all were set forth fully herein.

124.    The CLRA applies to Defendants' actions and conduct described herein because it extends to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

125.    NAF's arbitration services are "services" within the meaning of California Civil Code Section 1761 (b).

126.    Defendants violated the CLRA as follows;

127. In violation of Section 1770(a)(3), Defendants misrepresented their affiliation, connection, or association with one another;

128. In violation of Section 1770(a)(5), Defendants misrepresented that NAF arbitrations have characteristics and benefits that they do not have;

129. In violation of Section 1770(a)(9), Defendants advertised NAF Defendants' advertisements were misleading to or likely to deceive the reasonable consumer.

130. In violation of Section 1770(a)(14), Defendants represented that NAF sponsored arbitrations confer rights or remedies which they do not have or involve, or which are prohibited by law.

131.    Defendants concealed material facts regarding NAF arbitrations from Plaintiff, including that NAF is conflicted by its ownership structure and unable to fairly and impartially decide arbitrations. This type of information is relied upon by consumers in making purchase decisions, and is fundamental to the decision to enter into, agree to be bound by, or attempt to appeal an arbitration. Had Defendants disclosed this material information regarding NAF arbitrations to Plaintiff, he would not have agreed to arbitration before NAF. These omissions of material fact violated California Civil Code Section 1770(a) sub sections (3), (5), (9), (14), and (19).

132. As a result of Defendants' conduct, Plaintiff is entitled to actual and statutory damages, costs of litigation, and such other relief authorized under the CLRA.

## SECOND CAUSE OF ACTION

### (Violation of the Fair Debt Collection Practices Act (FDCPA) by Mann Bracken, LLP, Frederick J. Hanna & Associates, and Gerald E. Moore, P.C., and other debt collector Defendants

133. Plaintiff now re-alleges each and every fact and allegation as set forth above and below at length, and hereby incorporates same by reference, as if all were set forth fully herein.

134. Each of the non-bank / non-credit card company Defendants, including the NAF, are "debt collectors" as defined in 15 U.S.C. § 1692a(6), and in doing the acts alleged, were attempting to collect alleged consumer debts.

135. Mann Bracken violated, at minimum, 15 U.S.C. § 1692(e) by making false or misleading representations in their unfair attempts to collect debts from Plaintiff and by among other things: representing that NAF was a independent forum when it was not; representing that the awards issued by NAF were not subject to or the result of any conflict of interest, when they were; and representing that the additional fees and costs awarded against consumers were lawful when they were not. Mann Bracken further violated 15 U.S.C. § 1692(f), as its collusive efforts and debt collection practices as described herein constitute unfair and unconscionable means to collect debts. To the extent that the other debt collector defendants' employed collusive practices with the NAF and the credit card companies / banks to mislead consumers, they also violated 15 U.S.C. § 1692(f), as their collusive efforts and debt collection practices as described herein constitute unfair and unconscionable means to collect debts.

136. As a result of Defendants' actions, plaintiff lost sleep, suffered emotional trauma, and the same disrupted his entire household.

137. As a result of Defendants' violations of the FDCPA, Plaintiff was harmed, and is entitled

PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES

*ROBERT TOWNSEND V. NATIONAL ARBITRATION FORUM, INC., ET AL.*

36

to injunctive relief, and to recover actual and statutory damages and attorneys' fees and litigation costs pursuant to 15 U.S.C. § 1692k.

## THIRD CAUSE OF ACTION

### (Violation of the California "Rosenthal Fair Debt Collection Practices Act," California Civil Code § 1788, *et seq.*, by All Defendants)

138.  Plaintiff now re-alleges each and every fact and allegation as set forth above and below at length, and hereby incorporates same by reference, as if all were set forth fully herein.

139. Defendants are "debt collectors" within the meaning of California Civil Code § 1788.2(c).

140.  Plaintiff is a "debtor" within the meaning of California Civil Code § 1788.2(h), and in doing the acts alleged, were attempting to collect alleged consumer debts.

*141.* Defendants were engaged in the attempted collection of consumer debts, and are legally bound to follow the prescriptions of the Rosenthal Fair Debt Collection Practices Act ("RFDCP A"), California Civil Code § 1788, *et seq.*

142.  Defendants violated the RFDCPA, California Civil Code § 1788.l7, through their violations of 15 U.S.C. §§ 1692 (e) and (f) of the FDCPA, by making false or misleading representations in their unfair attempts to collect debts from Plaintiff, and by engaging in unconscionable and unfair collection practices in violation of the FDCPA 15 U.S.C. § 1692(f).

143. Defendants' violations of the RFDCPA were intentional and/or malicious.

144. As a result of Defendants' actions, plaintiff lost sleep, suffered emotional trauma, and the same disrupted his entire household.

145. As a result of Defendants' violations of the RFDCPA, Plaintiff was harmed and is entitled to damages under California Civil Code §1788.30.

## FOURTH CAUSE OF ACTION

### (Violation of Bus. & Prof. Code Section 17500 et seq.) by All Defendants

146. Plaintiff now re-alleges each and every fact and allegation as set forth above and below at length, and hereby incorporates same by reference, as if all were set forth fully herein.

147. Defendants engaged in a deceptive, misleading advertising and marketing campaign to exalt NAF as a neutral arbitration forum governed by the highest legal and ethical standards, completely independent from its debt collection counterparts, like Mann Bracken and the Hanna and Moore law firms. In fact, Defendants actively concealed their financial ties to one another, and such conflict prevented NAF from providing legitimate arbitration services.

148. Defendants violated Business and Professions Code Section 17500 by making or causing untrue or misleading statements with the intent to induce consumers to buy arbitration services from them. These untrue and misleading statements included, but are not limited to, those set forth above Defendants knew or should have known that the statements were untrue or misleading at the time they were made.

149. As a result of Defendants' untrue and misleading statements, Plaintiff lost money and suffered injury in fact, and thus is entitled to restitution, injunctive relief and such other relief authorized under Section 17535.

## FIFTH CAUSE OF ACTION

### (Violation of Bus. & Prof. Code Section 17200 et seq. by All Defendants)

150. Plaintiff now re-alleges each and every fact and allegation as set forth above and below at length, and hereby incorporates same by reference, as if all were set forth fully herein.

*151.* Defendants' conduct constituted unlawful, unfair, and fraudulent business acts or practices under Business and Professions Code Section 17200 *et seq.*

    a. Defendants' practices were unlawful in that they violated:  California Civil Code Section 1770(a) (Consumer Legal Remedies Act);

    b.  15 U.S.C. Section 1692 *et seq.* (Fair Debt Collection Practices Act);

    c.  California Civil Code Section 1788 *et seq.* (Rosenthal Fair Debt 2811 Collection Practices Act);

    d.  California Business and Professions Code Section 17500 *et seq.* (False Advertising Law); and

    e.  California Code of Civil Procedure, Section 1280 *et seq.* (California Arbitration Act).

PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES                                        38
*ROBERT TOWNSEND V. NATIONAL ARBITRATION FORUM, INC., ET AL.*

152.    Defendants' practices were unfair because any utility for Defendants' conduct is outweighed by the gravity of the consequences to Plaintiff and/or Defendants' conduct is immoral, unethical, oppressive, unscrupulous or substantially injurious to Plaintiff.

153.    Defendants' practices were fraudulent because they were likely to and did deceive Plaintiff and Defendants engaged in such practices knowingly.

154.    Defendants' unfair and fraudulent practices include, but are not limited to, the following:

    a.    promoting, marketing, and selling purportedly legitimate arbitration services, with no intent to provide them as advertised;

    b.    charging and collecting improper and illegitimate fees and costs for arbitration services that were not rendered; and

    c.    deceiving courts to confirm bogus arbitration awards as judgments" falsely claiming they were issued by independent arbitrators.

155. As a result of Defendants' acts of unfair competition, Plaintiff lost money and suffered injury in fact, and thus are entitled to restitution, injunctive relief and such other relief authorized under Section 17203.

## SIXTH CAUSE OF ACTION

**Conspiracy to Impose Mandatory Arbitration Clauses in Violation of 15 U.S.C. §1 ISO by All Defendants.**

156. Plaintiff now re-alleges each and every fact and allegation as set forth above and below at length, and hereby incorporates same by reference, as if all were set forth fully herein.

157. Beginning at a time unknown to Plaintiff and continuing to the present, Defendants participated in a contract, combination and conspiracy to impose or maintain compulsory arbitration clauses on their cardholders and the cardholders of their co-conspirators.

158. Defendants engaged with their competitors in the following: Mutually interdependent conduct; direct discussion of present and future plans concerning compulsory arbitration clauses; an exchange of information regarding compulsory arbitration clauses; and an understanding and/or agreement to uniformly impose materially identical compulsory arbitration clauses.

159. By colluding with their competitors to insert and impose compulsory arbitration clauses in their

"cardholder agreements," Defendants and their co-conspirators intended to and did suppress competition. Defendants had a common motive to collude in that they would benefit by impeding access to the court system to shield themselves from potential liability arising from their illegal conduct.

160. Defendants' collusion to impose and maintain arbitration clauses, in violation of the Sherman Act, renders the clauses void and unenforceable. Accordingly valid and binding agreements to arbitrate were never formed, Plaintiff was deprived of any meaningful choice on a critical term and condition of their general purpose card accounts as a result of the conspiracy.

161. The Defendants' conduct constitutes a *per se* violation of §1 of the Sherman Act. Alternatively, their conduct constitutes an unreasonable restraint of trade when judged against the rule of reason.

162. As a result of Defendants ' ongoing conduct, Plaintiff has suffered and will continue to suffer loss or damage, and threatened loss or damage, to his business or property and otherwise.

### SEVENTH CAUSE OF ACTION

### <u>Group Boycott/Concerted Refusal to Deal in Violation of 15 U.S.C. §1 by All</u>
### <u>Defendants</u>

163. Plaintiff now re-alleges each and every fact and allegation as set forth above and below at length, and hereby incorporates same by reference, as if all were set forth fully herein.

164. Defendants have collectively refused to deal with any cardholder who refuses to accept arbitration clauses as a term and condition of their cardholder agreement.

165. Defendants' collective conduct bas enabled them to exact for themselves better trade terms than they could obtain if they competed with each other.

166. Defendants' concerted activity has inhibited competition and harmed consumers because Defendants have obtained a non-price trade advantage, which would not be available in the absence of concerted activity and has resulted in supra-competitive profits by shielding Defendants from liability arising from any illegal conduct.

167. This concerted conduct renders the arbitration clauses voidable and unenforceable.

168. Accordingly, valid and binding agreements to arbitrate were never formed.

169. The Defendants' conduct constitutes a *per se* violation of § 1 of the Sherman Act.

170. Alternatively, their conduct constitutes an unreasonable restraint of trade when judged against the

PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES
*ROBERT TOWNSEND V. NATIONAL ARBITRATION FORUM, INC.,* ET AL.

40

rule of reason.

171. As a result of Defendants' ongoing conduct, Plaintiff suffered and will continue to suffer loss or damage, and threatened loss or damage, to his business or property and otherwise.

## EIGHTH CAUSE OF ACTION

### *Defendants and each of them or other persons acting on their behalf*
### (*USE OF MAIL AND WIRE FRAUD TO DEPRIVE PLAINTIFF OF RIGHT TO HONEST SERVICES, per* 18 U.S.C.A. § 1346)

172. Plaintiff now re-alleges each and every allegation and fact as set forth above and below at length, and hereby incorporates same by reference, as if all were set forth fully herein.

173. Defendants deprived Plaintiff of his Right to Honest Services by: their unfair and unconscionable means employed to collect alleged debts in violation of the FDCPA §1692f and RFDCPA §1788.17; concealment of their conflicts of interest related to the NAF, and misrepresentations designed to facilitate concealment of their conflicts of interest related to the NAF; by concealing and/or falsifying information regarding the ownership structure of the NAF and its relationship with the credit card companies and named debt collector Defendants; by facilitating and engaging in a debt-collection case referral kickback scheme to enrich the debt collector Defendants, in exchange for their steering and referring alleged debts to the NAF; and engaging in mail and wire fraud to accomplish the aforementioned ends.

174. Defendants foresaw or reasonably should have foreseen" that their actions could cause economic harm to Plaintiff.

175. Defendants possessed a fraudulent intent and misrepresentations about the NAF and their relationships to the NAF, that had the natural tendency to influence or were capable of influencing Plaintiff to simply pay the alleged debts at the amounts claimed due by the debt collector Defendants, regardless of the accuracy of those amounts claimed due.

176. Use of mail and wire fraud to deprive Plaintiff of his right to honest services is a predicate act for the purposes of 18 U.S.C. §§ 1961 and 1964(c).

## NINTH CAUSE OF ACTION

*All Defendants or other persons acting on their behalf*

**_PARTIAL LIST OF RICO PREDICATE ACTS_** **against all Defendants other than BANK OF AMERICA (Civil RICO - Violation of 18 U.S.C. § 1961 et seq. against all other Defendants)**

177. Plaintiff now re-alleges each and every fact and allegation as set forth above and below at length, and hereby incorporates same by reference, as if all were set forth fully herein.

178. Beginning in or about June 2006, Defendants and other persons acting on their behalf and their individual employees, knowingly, willfully conspired and agreed among themselves to engage in unwarranted collection activities against Plaintiff although Plaintiff disputed the alleged debt that then became the subject of aggressive collection activities. Defendants progressively joined the conspiracy as the alleged debt, was passed around from related company to company.

179. Defendants and each of them or other persons acting on their behalf did knowingly conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO *enterprise* through a continuing and established *pattern of racketeering activity*, frequently used by the Defendants and each of them, not only against this Plaintiff but other users of general purpose Credit Cards issued by Defendants, which included the following:

   a. Did conspire among themselves to intimidate, threaten, and otherwise force credit card holders, including Plaintiff, to pay money not lawfully due under threat of reporting negative payment history information about them to credit reporting agencies, demanding rigged arbitration hearings, stating that they would forward "Obtain a copy of a judgment and mail copy of such judgment" filing lawsuits against them and otherwise causing them financial, emotional and permanent psychological harm.

180. During the past ten (10) or more calendar years preceding the filing of the original complaint in this matter, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18

U.S.C. 1962(c) (Prohibited activities).

181. Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner that they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of the RICO law at 18 U.S.C. 1962(c) *supra*.

182. Specific to the foregoing two paragraphs, Plaintiff has personally been injured, as defined in 1962(c) of the RICO act Chapter 96 of Title 18 of the United States Code, 18 U.S.C. § 1961–1968.) Under Section 1962(b), said injuries consist in having been and currently being reported negatively to various credit reporting agencies when he had done nothing wrong or illegal, for the sole purpose of obtaining money from him.

183. Liability attaches to the individual Defendants and corporate Defendants other than NAF under Section 1962(c), in that said Defendants did, at all times mentioned herein, conspire among themselves to violate subsections (a), (b) and/or (c) of said section. Such conspiracy took place at times and places known only to Defendants but may be found through discovery.

184. Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized above are to be liberally construed by this honorable Court. Said construction rule was never codified in Title 18 of the United States Code, however.

### TENTH CAUSE OF ACTION

*All Defendants or other persons acting on their behalf*

*Prohibited Racketeering Activity:*

*18 U.S.C. § 1962(a)-(c)*

185. Plaintiff now re-alleges each and every fact and allegation as set forth above, and hereby incorporates it by reference, as if all were set forth fully herein.

186. At various times and places, the details of which are known only to Defendants at this time, Defendants did conspire to acquire and maintain an interest in a RICO *enterprise* engaged in a *pattern of racketeering activity* via activities outlined in this Complaint's Statement of Facts, to wit, Defendants and each of them or other persons acting on their behalf in violation of 18 U.S.C. §§ 1962(b) and (d).

PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES
*ROBERT TOWNSEND V. NATIONAL ARBITRATION FORUM, INC., ET AL.*

43

187. At various times and places partially known to Plaintiff as outlined in this Complaint's Statement of Facts, Defendants did also conspire to conduct and participate in said RICO *enterprise* through a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(c) and (d). See also 18 U.S.C. §§ 1961(4), (5) and (9) as more fully alleged hereafter.

188. During the past ten (10) or more calendar years preceding the date of the filing of Plaintiff's complaint all Defendants did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d) as herein detailed.

189. Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner, which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of 18 U.S.C. 1962(d) (Prohibited activities *supra*).

190. Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized above are to be *liberally* construed by this honorable Court.

191. To carry out the plan, Defendants communicated with Plaintiff both by means of mail and telephone, claiming incessantly that he owed the alleged Credit card debt, although vigorously disputed by Plaintiff in many letters. In particular, Defendants and each of them or other persons acting on their behalf notified Plaintiff through the mail in, 2006, 2007 and 2008 that he was delinquent on alleged debts due to Defendants; each of them or other persons acting on their behalf contacted Plaintiff seeking payment of the disputed alleged debt prior to Plaintiff commencing this Federal Action.

192. Further, Plaintiff is informed and believes, and thereon alleges that commencing in or about June 2007, Defendants and each of them or other persons acting on their behalf, used the phones and mail to negotiate an assignment of various alleged debt among and between them, for collection notwithstanding the legitimate dispute and the falsities of the amounts claimed due by Defendants and each of them or other persons acting on their behalf, as well as the corrupt undisclosed calculation thereof the claimed amounts.

193. Plaintiff is informed and believes, and thereon alleges, that Defendants, to further ends of the conspiracy, used the mail and telephone to effect arbitrary assignments and reassignments of the alleged debt among and between themselves, in order to obscure the true legal status, character, and amount of the alleged debt, for the purposes of mitigating

the necessity for Defendants to comply with various State and Federal Laws, including the State of California Rosenthal FDCPA, as well as the Federal FDCPA, all in furtherance of the conspiracy.

194. Defendants and each of them or other persons acting on their behalf invited Plaintiff to use the phone lines and mail to communicate with them about the alleged debt. He communicated in writing with each corporate Defendant on a number of occasions between June 2006 and April 2008 in order to dispute the validity of the alleged debt, including with GMA, WAP, AMP, HANNA, and FNCB, and others on the dates listed in this Complaint's Statement of Facts.

195. Defendants and each of them or other persons acting on their behalf either completely ignored communications from Plaintiff, provided documents that were unreadable, unintelligible, and incomprehensible, and continued to harass Plaintiff via innumerable telephone calls, all actions designed to further vex and frustrate Plaintiff for the sole purpose of furthering the conspiracy.

196. Plaintiff is informed and believes, and thereon alleges, that each of the Defendants at various times from June 2006 to the present, have used the mail and telephone lines as well as other forms of electronic communication to notify Credit Reporting Agencies that Plaintiff was delinquent, had defaulted and the alleged debt had been written off as a bad debt, notwithstanding the fact that Defendants and each them knew or should have known that a legitimate dispute existed with the Plaintiff per the FDCPA and California FDCPA. The Defendants' intentional combination of inaction and conspiratorial activities forced Plaintiff to bring this action in Federal Court. Defendants and each of them furthered the conspiracy by executing documents or causing documents to be executed to conceal the fraudulent acts of one to the other all in a furtherance of the conspiracy to illegally collect funds from the Plaintiff.

197. Plaintiff is informed and believes, and thereon alleges, that Defendants guided the operation of the conspiracy. At various times, in advance of this litigation, the various Defendants have each represented themselves as the designated collection agent for one another, but have refused and continue to refuse through the current date to provide any documentation of the assignment or purchase of the alleged debt; nor the method of computing the alleged amount due, all in furtherance of the conspiracy. Defendants and

PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES

*ROBERT TOWNSEND V. NATIONAL ARBITRATION FORUM, INC., ET AL.*

each of them attempted to use the mails and telephone wires in their efforts to obtain from the Plaintiff money by false pretenses and representations, all in violation of 18 U.S.C, Sections 1341 and 1343.

198. Plaintiff is informed and believes and thereon alleges the established system for the making of decisions in furtherance of the enterprise and conspiracy consisted of the following: personal meetings of the Defendants and each of them outside of the normal business environments and hours of each, for the specific purpose of making the necessary decisions to manage and direct the enterprise via groups; spontaneous individual social meetings; gatherings, including but not limited to exercise facilities, golf courses, bowling alleys, bars, cocktail lounges, and dinners; other forms of electronic communication such as e-mails on personal computers; conversations via personal and business cell phones; as well as invitations to the respective residences or other venues of the Defendants and each of their employees named as Defendants herein.

199. Plaintiff is informed and believes and thereon alleges that the conspiracy is ongoing, because the net effect of the collection actions Defendants initiated are still pending, e.g., damage to Plaintiff's credit score. Defendants' acts constituted and do still constitute prohibited activities as described in 18 U. S. C. Section 1962(c) and (d).

200. As a proximate result of the wrongful acts as herein alleged, the Plaintiff has suffered economic injury as a result of the negative reports made about him, made by Defendants and each of them to credit reporting agencies. As a result of a lowered credit score, the cost of credit for the Plaintiff has substantially increased, if any can now be found in the current difficult economic and credit climate. Plaintiff has also missed important activities, including his medical care for injuries inflicted upon him by Defendants, in order to meet with legal researchers and authorities; research statutes; prepare pleadings; and pursue his constitutional rights of redress for the wrongs, negligently, deliberately inflicted upon him by the Defendants; and to make Court appearances. Plaintiff's injuries are subject to proof at trial.

201. Further, Plaintiff is entitled to treble damages pursuant to 18 U.S.C. Section 1964(c).

PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES

*ROBERT TOWNSEND V. NATIONAL ARBITRATION FORUM, INC.*, ET AL.

## ELEVENTH CAUSE OF ACTION

### *Defendants and each of them or other persons acting on their behalf*

### (*CONSPIRACY TO ENGAGE IN PROHIBITED RACKETEERING ACTIVITY*,

### *per* USC § 1962 (d))

202. Plaintiff now re-alleges each and every allegation and fact as set forth above and below at length, and hereby incorporates same by reference, as if all were set forth fully herein.

203. Defendants constituted an enterprise operating in and affecting interstate and foreign commerce at their direction or with their knowledge knowingly, willfully and unlawfully did conspire, agree and/or combine together with each other to associate with, conduct, participate in and further the affairs of the enterprise through pattern of racketeering activity in violation of 18 USC § 1962 (c). Such conspiracy is unlawful and violates 18 USC § 1962 (d).

204. The object of the conspiracy was to associate with, participate in, and conduct the affairs of The Fraudulent Enterprise, in part, by inducing Plaintiff to make payments to the various Defendants on the alleged debt, regardless of the validity of the various inconsistent amounts due claimed by Defendants in their myriad collection letters.

205. The overt acts committed or facilitated by Defendants to accomplish the above described unlawful conspiracy include but are not limited to the illegal acts as set forth in paragraphs hereinabove, and specifically the predicate acts as described in the above paragraphs and this Complaint's Statement of Facts, all of which constitute a pattern of racketeering activity as defined in 18 USC § 1962 *et seq.*

206. By reason of the aforementioned racketeering enterprise activities, Defendants (and persons acting on their behalf, at their direction or with their knowledge)'s ability to defraud Plaintiff was immeasurably enhanced, because the illegal operation of the enterprise facilitated the fraud and aided its concealment, thereby damaging Plaintiff. Accordingly, Plaintiff is entitled to an award of threefold actual damages and such other relief as this Court deems necessary and proper, per 18 USC § 1964(c).

207. In summary, Defendants' multiple and egregious violations of the Federal Fair Debt Collection Practices Act, the California Rosenthal Fair Debt Collection Practices Act, and other statutes described herein, combined with Defendants' RICO-related activities

as enumerated above, as evidenced by the facts and allegations stated within this Complaint, have severely damaged Plaintiff.

## PRAYER

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

### As to the First Cause of Action

1. For actual damages, including economic damages and emotional distress, in the amount of $50,000.00 or such amount as the trier of fact may see fit to award;

2. For punitive damages where authorized by statute; and

3. Monetary cost of legal research.

### As to the Second Cause of Action

1. For actual damages, including economic damages and emotional distress, in the amount of $50,000.00 or such amount as the trier of fact may see fit to award;

2. For maximum statutory damages, i.e., $1,000.00 per violation;

3. Monetary cost of legal research.

### As to the Third Cause of Action

1. For actual damages, including economic damages and emotional distress, in the amount of $50,000.00 or such amount as the trier of fact may see fit to award;

2. For maximum statutory damages, i.e., $1,000.00 per violation;

3. For punitive damages; and

4. Monetary cost of legal research.

### As to the Fourth, Fifth, Sixth, and Seventh Causes of Action

1. For actual damages, including economic damages and emotional

distress, in the amount of $50,000.00 or such amount as the trier of fact may see fit to award;;

2.    For punitive damages where authorized by statute; and

3.    Monetary cost of legal research.

As to the Ninth, Tenth, and Eleventh Causes of Action

1.    For threefold actual damages, including economic damages and emotional distress, in the amount of $100,000.00 or such amount as the trier of fact may see fit to award;

2.    That this Honorable Court order any person or corporate entity among named Defendants to divest of any interest, direct or indirect, in any enterprise; impose reasonable restrictions on the future activities or investments of Defendants, including, but not limited to, prohibiting Defendants from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; and order dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

4.    Monetary cost of legal research.

As to All Causes of Action

1.    For costs of suit incurred herein; and

2.    For such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff requests a jury trial on all matters for which a jury trial is guaranteed.

PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES
*ROBERT TOWNSEND V. NATIONAL ARBITRATION FORUM, INC., ET AL.*

DATED:  December 21, 2009

Respectfully submitted,

By: _____

Robert Townsend
P. O Box 3330
Dana Point, CA 92629
Phone: (949) 495-0089
Fax:   (949) 495-0580
townsend@runbox.com

Plaintiff In *Pro Per*

I, ROBERT TOWNSEND declare:

1. I am the plaintiff in this action.

2. I declare that the complaint therein is being filed concurrently with the filing of this declaration in a proper place for the trial thereof, which is ORANGE COUNTY, CA,  the county in which the defendant resides or the county in which the defendant has his or her principal place of business or the county in which the defendant is doing business, which is the county in which the transaction, the subject matter of the above-captioned action, or a substantial portion thereof, occurred].

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DECEMBER 21, 2009

(Robert Townsend, Pro Se)

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Percy Anderson and the assigned discovery Magistrate Judge is Marc Goldman.

The case number on all documents filed with the Court should read as follows:

## CV09- 9325 PA (MLGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===============================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.

Robert Townsend
P. O Box 3330
Dana Point, CA 92629
Phone: (949) 495-0089
Fax:  (949) 495-0580
townsend@runbox.com

# FOR OFFICE USE ONLY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | CASE NUMBER |
|---|---|
| Robert Townsend<br><br>PLAINTIFF(S)<br>v.<br>NATIONAL ARBITRATION FORUM, INC.;<br>NATIONAL ARBITRATION FORUM, LLC; AGORA<br>FUND 1GP, LLC; MANN BRACKEN, LLP; MB<br>SOLUTIONS, INC.; ACCRETIVE, LLC; (see list<br>attached for remaining defendants) DEFENDANT(S). | **CV09-9325 PA(MLGX)**<br><br><br>**SUMMONS** |

TO:    DEFENDANT(S): _____

A lawsuit has been filed against you.

Within _21_ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _K. H. Townsend_ whose address is _PO Box 3330, Dana Pt CA 92629_. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: ___DEC 2 1 2009_____

By: _____
Deputy Clerk

NANCY CASTRO

SEAL

(Seal of the Court)

# FOR OFFICE USE ONLY

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

ESKANOS AND ADLER, P.C.; DISPUTE MANAGEMENT SERVICES, LLC, d/b/a/
FORTHRIGHT, INC.; AXIANT, LLC; J.P. MORGAN CHASE; CHASE BANK USA, N.A.;
BANK OF AMERICA, N.A.; WELLS FARGO & COMPANY, INC.; WELLS FARGO
BANK, N.A.; FIRST NATIONAL BANK OF NEBRASKA, INC.; FIRST NATIONAL
BANK OF OMAHA, N.A.; FIRST NATIONAL COLLECTION BUREAU, INC.; GERALD
E. MOORE & ASSOCIATES, P.C.; HANNA & ASSOCIATES, P.C.; WEST ASSET
MANAGEMENT, INC.; WORLDWIDE ASSET PURCHASING, LLC; WORLDWIDE
ASSET MANAGEMENT, INC. WORLWIDE ASSET PURCHASING II, LLC;
FREDERICK J. HANNA & ASSOCIATES, P.C.; ASSET MANAGEMENT
PROFESSIONALS, LLC; PALISADES COLLECTIONS, LLC; ASTA FUNDING, INC.;
ASTA GROUP INC.; ASTA FUNDING ACQUISITION I, LLC; ASTA FUNDING
ACQUISITION II, LLC; ASTA FUNDING ACQUISITION III, LLC; (NJ)ASTA
COMMERCIAL, LLC; LOUIS R. FEINGOLD, ESQ.; TYE HANNA; FREDERICK J.
HANNA, ESQ. DARRELL T. J. MICHAEL CLINE; MICHAEL KELLY; W.
CHRISTOPHER BRACKEN III; CLAYTON DAVIS MOSELY; WILLIAN CRISTOPHER
BRACKEN II; M. DOUGLAS MANN; JAMES D. BRANTON; GERALD E. MOORE,
ESQ., DENNIS E. HENRY, ESQ.

Does 1-10, inclusive

REMAINING DEFENDANTS